IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Case No. 4:21-cv-00022-M

JTH TAX LLC d/b/a LIBERTY TAX
SERVICE f/k/a JTH TAX, INC.,

     Plaintiff/Counter Defendant,

v.

CMB TAX SERVICE, LLC,
JEFFREY SERBUS, AND
CINDY SERBUS,

     Defendants/Counter Claimants.

**ORDER**

These matters come before the court on a Motion to Dismiss Counterclaim [DE 42] and

Motion to Strike Jury Demand [DE 44] filed by Plaintiff/Counter Defendant JTH Tax LLC d/b/a

Liberty Tax Service ("Liberty"), and a Motion for Show Cause Order and Finding of Contempt

[DE 46] filed by Defendants/Counter Claimants CMB Tax Service, Jeffrey Serbus, and Cindy

Serbus ("the Serbuses"). For the reasons that follow, the court grants in part and denies in part the

motion to dismiss, grants the motion to strike, and reserves judgment on the motion for a show

cause order, as set forth herein.

**I.      Motion to Dismiss**

Liberty initiated this action on March 5, 2021, and filed the operative Amended Complaint

on March 12, 2021, alleging generally that the Serbuses breached franchise agreements with

Liberty by failing to comply with the agreements' post-termination obligations and covenants.

Am. Compl. DE 9. At the parties' request, the court issued a Consent Order for Preliminary

Injunction on March 23, 2021, regulating (as agreed) the parties' conduct related to the subject

transactions. Ord., DE 33. In response to the Amended Complaint, the Serbuses filed an Answer and Counterclaim, in which they allege the following causes of action: (1) breach of contract, (2) defamation, (3) unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, et seq., (4) conversion, (5) tortious interference with prospective economic advantage, and (6) "punitive damages" under N.C. Gen. Stat. § 1D-1. DE 38.

In the current motion, Liberty seeks an order dismissing the counterclaims in their entirety for the Serbuses' failure to state plausible claims for relief. Liberty contends that all non-contract claims are barred by the economic loss rule, all claims based on North Carolina law are improper in light of the parties' agreement to apply Virginia law, and, in the alternative, the Serbuses fail to allege facts supporting plausible claims based on either North Carolina or Virginia law. The Serbuses respond that Liberty improperly relies on its own allegations in seeking dismissal of the Serbuses' claims; concede that Virginia law applies to the second, fourth, and fifth claims, but argue that North Carolina law properly applies to the third claim; and contend that the factual allegations support plausible claims for relief. Liberty replies that the Serbuses' failure to file an amended pleading restating claims two, four, and five under Virginia law dooms those claims and that, taking all allegations made by the parties in this case as true, the Serbuses still fail to state plausible claims for relief.

A.     The Serbuses' Statement of Facts[1]

The following are relevant factual allegations (as opposed to statements of bare legal conclusions, unwarranted deductions of fact, or unreasonable inferences) made by the Serbuses in the operative Counterclaim (DE 38), which the court must accept as true at this stage of the

---

[1] To the extent that Liberty's undisputed factual allegations assist in bringing context to the Serbuses' allegations, the court will consider them here. *See Suntrust Mortg., Inc. v. Busby*, 651 F. Supp. 2d 472, 477 (W.D.N.C. 2009).

2

proceedings pursuant to *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

As part of its tax preparation business, Liberty has developed a system for the operation of tax preparation offices, in which a franchisee owns and operates a tax preparation organization using Liberty's name and services within a designated territory and agrees to pay Liberty royalties and other fees. To assist with building out its franchises, Liberty relies on area developers, who assist Liberty with the sale and resale of franchise territories in exchange for half of the royalties paid to Liberty by its franchises.

At franchise locations, the franchisees must bear the costs of operating the stores, including but not limited to, leasing the locations, securing equipment, and hiring employees. To generate income, franchisees charge fees to customers for preparation of the customers' tax returns. Because the preparation of tax returns at franchisee store locations is done using Liberty's software, tax preparation fees charged to customers are processed by Liberty. Liberty then transmits the fees, less any offsets for royalties or other amounts owed, to its franchisees.

Liberty also directly owns and operates certain store locations. At these locations, Liberty collects all the fees charged to customers. Liberty does not directly operate all of its stores because the overhead of owning and operating certain stores renders many stores unprofitable, presenting a business risk passed on by Liberty to its franchisees. However, when the fees generated by a store exceed overhead, Liberty stands to gain by directly operating a store, rather than collecting royalties from its franchisees.

Prior to the events underlying this litigation, the Serbuses were Liberty franchisees for several years. Over time, the Serbuses entered several franchise agreements with Liberty for franchises in ten territories (collectively, the "Franchise Agreements") as follows:

a. On December 22, 2015, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC079.

3

b. On July 5, 2016, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC044. The Serbuses operated this Liberty franchise office at 345 Western Blvd., Jacksonville, NC.

c. On March 23, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC045. The Serbuses operated this Liberty franchise office at 2011 Lejeune Blvd, Jacksonville, NC.

d. On March 23, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC046. The Serbuses operated Liberty franchise offices at 521 Yopp Road, Jacksonville, NC and 1128 Western Blvd, Jacksonville, NC.

e. On March 23, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC227.

f. On May 31, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC058. The Serbuses operated this Liberty franchise office at 474 Hwy 70 W, Havelock, NC.

g. On December 20, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC080. The Serbuses operated this Liberty franchise office at 415 S. College Rd, Wilmington, NC.

h. On December 20, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC081. The Serbuses operated this Liberty franchise office at 2642 Carolina Beach Rd, Suite 13, Wilmington, NC.

i. On December 20, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC082. The Serbuses operated this Liberty franchise office at 5042 Market Street, Wilmington, NC.

j. On December 20, 2017, CMB Tax entered into a Franchise Agreement with Liberty for the territory known as NC083. The Serbuses operated this Liberty franchise office at 5202 Carolina Beach Rd, Wilmington, NC.

When the Serbuses purchased these respective franchises, they paid Liberty franchise fees for each territory, ranging from $12,500 for their first territory to $500,000 for several territories covering the greater Wilmington area. In addition, they paid a royalty of 14% of fees generated, plus a 5%

4

fee for advertising. As part of its written and oral marketing, Liberty represented to the Serbuses that area developers were instructed to use the referenced resale formula in valuing franchises for resale to new franchisees and Liberty's then-CEO John Hewitt stated that the going rate for the resale of a Liberty franchise was 1.2–1.3 times the gross receipts of the franchise in the prior year. The Serbuses purchased one of their Wilmington franchises according to this formula, paying 1.25 times the gross receipts of the franchise in the prior year.

Further, the Franchise Agreements provide that, if Liberty desired to purchase the Serbuses' franchise territories, it could do so for the greater of $150,000 or 200% of the gross receipts of the territory for the previous twelve months. In the year prior to February 26, 2021, the Serbuses' gross receipts for all of their franchises was approximately $1,300,000. The Serbuses' stores were among the most successful of Liberty's franchises. Randy Galley, Liberty's manager for stores in Northern Virginia, described the Serbuses' franchises as "one of the most well-run organizations" with which Liberty worked. The Serbuses worked diligently to develop their franchises as well-regarded businesses within the local community that were attentive to the franchises' customers and employees.

Beginning in 2016, the United States Department of Justice investigated Liberty for alleged tax preparer fraud in certain stores (none of which were owned by the Serbuses). In or about September 2017, Liberty fired its founder and CEO John Hewitt. Following the expiration of his non-compete agreement with Liberty in or about March 2019, Hewitt started a new tax preparation service in direct competition with Liberty. Liberty falsely believed that Hewitt reached out to the Serbuses in an attempt to recruit the Serbuses away from Liberty; however, Hewitt never contacted the Serbuses about leaving their Liberty franchises, and they had no interest in doing so.

As part of its contractual obligations under the Franchise Agreements, Liberty agrees to

5

provide tax preparation software and technical support for such software, which franchisees are required to use to prepare tax returns. Beginning in or about January 2021, an unknown individual/entity "hacked" Liberty's software and proceeded to modify the tax returns Defendant CMB Tax prepared for its customers. The hacker provided fraudulent tax return information in order to collect refunds. As a result of this hacker's activities, the Serbuses' employees were blacklisted by Liberty and fired because the hacker had filed tax returns using the employees' information. The Serbuses sought technical assistance from Liberty to help mitigate the breach of Liberty's tax return software by the unknown hacker, but Liberty was unable to fix the breach. As a result, the Serbuses were unable to collect their fees for preparation of their customers' returns. Rather than address its failure to provide adequate tax return preparation software and technical support, Liberty attempted to blame the Serbuses for tax fraud perpetrated pursuant to its own insecure software. The Serbuses allege that based on the success of their business, the unsubstantiated fear that the Serbuses would attempt to leave Liberty to do business with a competitor, and Liberty's failure to contain a serious breach of security in its own tax software, Liberty determined to seize the Serbuses' franchises for its own gain and to cover up its mistakes.

In mid-February 2021, the Serbuses received a call from Liberty's Head Compliance Officer ("CO"). The CO advised that he had received anonymous calls from the Serbuses' employees, and he accused the Serbuses not only of failing to comply with certain requirements in their franchise agreements, but also of requiring employees with Preparer Tax Identification Numbers ("PTINs") to share them with employees who did not have PTINs and/or allowing employees without PTINs to illegally file tax returns. The Serbuses' policy provided that only an individual with a PTIN could prepare a tax return. Contrary to the CO's assertions, the Serbuses were without knowledge of, and did not require or allow, any deviation from their policy regarding

6

filing tax returns. Liberty also accused the Serbuses of other misconduct, such as not completing Liberty's trainings and not providing appropriate work conditions. The Serbuses believe Liberty never made a sincere effort to investigate the truthfulness of the allegations made against the Serbuses but sought to use the "investigation" as a pretext by which to seize the Serbuses' franchises. They also assert that Liberty's CO, a lawyer by training, interrogated the Serbuses in an effort to confuse them and obtain responses that, in Liberty's view, confirmed its false narrative.

On February 26, 2021, the Serbuses and Liberty representatives, including Peter Siachos, Liberty's corporate lawyer, and Cory Hughes ("Hughes"), Liberty's Vice President East Region, participated in a 9:00 a.m. conference call. The Serbuses assert that, without notice or an opportunity to cure in accordance with the franchise agreement, Liberty terminated the Serbuses' franchise agreements and demanded that the Serbuses cooperate fully or face punishment. They also claim that, to further pressure the Serbuses, Liberty arranged for two of its employees—Stacey Barnes ("Barnes") and Randy White ("White"), whom the Serbuses knew and trusted for many years—to meet the Serbuses at their office. Out of fear and shock from the telephone call, the Serbuses showed Barnes and White the stores, turned over all sets of keys, and traveled to all offices in Jacksonville together. Liberty sent the Serbuses a termination letter dated February 26, 2021, which purports to terminate the Serbuses' franchise agreements.

The Serbuses assert that Liberty sought to terminate the franchise agreements solely because their franchises were more profitable to Liberty if operated as corporate stores. By seizing the Serbuses' stores, Liberty was able to immediately take credit for the success of the franchises and reported revenues generated from the franchises to its shareholders.

Days after the February 26 call, Mitch Brown ("Brown"), manager of Liberty's corporate owned stores, arrived and changed all locks on the buildings, thereby excluding the Serbuses from

access to their stores to operate not only their tax preparation businesses, but also Jeffrey Serbus' insurance business. The Serbuses also were denied access to all tangible personal property they had purchased to operate their franchises, such as office equipment, furniture, appliances, and other items. In conjunction with changing locks on the Serbuses' stores, Liberty called the Serbuses' landlords for each of the store locations and informed them that the Serbuses' franchises had been terminated because the Serbuses engaged in unlawful conduct, and that the leases for each of the franchise stores must be signed over to Liberty.

Liberty owes the Serbuses more than $415,758 of unpaid fees and rebates for tax returns prepared prior to Liberty's termination of the franchise agreements. Under the "Automatic Payment Transfer" provision of the agreements, Liberty is required "to remit" to the Serbuses these fees, yet it has failed to do so.

In addition, Liberty has delayed assuming responsibility for the utilities and other business expenses at the store locations seized from the Serbuses, leaving them responsible for paying these expenses. Moreover, Liberty has failed to promptly take the steps necessary to assign the Serbuses' leases for the stores to Liberty. Liberty has retained deposits for leases of the franchise locations that belong to the Serbuses. Further, Liberty has represented to numerous individuals, including the landlords with whom the Serbuses did business (i.e., Victoria Wooten, Stephen Rudolph, and Omar Kharbat), the Serbuses' former employees, and members of the Jacksonville, Havelock, and Wilmington communities, that the Serbuses engaged in illegal conduct and imposed inappropriate workplace conditions upon their employees. The Serbuses believe Liberty's statements have damaged their reputation in their community, and its termination of the franchise agreements has negatively impacted the future value of the franchises to the Serbuses, which is calculated to be in excess of $2.5 million.

8

B. <u>Legal Standards</u>

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all of the well-pleaded factual allegations contained within the pleading and must draw all reasonable inferences in the plaintiff's favor, *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017), but any legal conclusions proffered by the plaintiff need not be accepted as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The *Iqbal* Court made clear that "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

To survive a Rule 12(b)(6) motion, the non-movant's well-pleaded factual allegations, accepted as true, must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (addressing motion to dismiss counterclaims). *Twombly*'s plausibility standard requires that the non-movant's well-pleaded factual allegations "be enough to raise a right to relief above the speculative level," i.e., allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Id.* at 555–56. A speculative claim resting upon conclusory allegations without sufficient factual enhancement cannot survive a Rule 12(b)(6) challenge. *Iqbal*, 556 U.S. at 678–79 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2)); *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) ("'naked assertions' of wrongdoing necessitate

9

some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557)). Courts must draw all reasonable inferences in favor of the non-movant. *E.I. du Pont de Nemours*, 637 F.3d at 440.

C.      Analysis

At the outset, the court notes the Serbuses do not dispute that their sixth counterclaim for "punitive damages" should be dismissed as a separate and independent cause of action. *See Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (finding "[p]unitive damages are not a cause of action" under North Carolina law); *Augustin v. SecTek, Inc.*, 807 F. Supp. 2d 519, 526 (E.D. Va. 2011) ("Under Virginia law, there is no cognizable cause of action for malice or punitive damages.") (citing *Albright v. Burke & Herbert Bank & Trust Co.*, 249 Va. 463, 457 S.E.2d 776, 778 (1995)). The Serbuses' sixth counterclaim is dismissed for their failure to state a plausible claim for relief.

Moreover, the Serbuses concede that the second, fourth, and fifth counterclaims should be alleged pursuant to Virginia law. Resp. at 21 n.3, DE 58. While the proper response to the Serbuses' concession would have been to amend their pleading, the court finds (as set forth in detail below) that the elements necessary to prove each of these claims are sufficiently pled for the court to engage in a meaningful analysis under Virginia law of Liberty's motion, and as described below, the court will direct the Serbuses to file an Amended Counterclaim in accordance with this order.

With respect to counterclaims one through five, the court finds as follows.

1.      *Breach of Contract* – Counterclaim One

For their first counterclaim, the Serbuses allege a breach of contract under Virginia law. In the present motion, Liberty contends that the Serbuses fail to identify any contractual provision

10

that has been allegedly breached and, thus, the Serbuses state no plausible claim for relief. The Serbuses respond that their counterclaim plausibly alleges Liberty has breached the duty of good faith and fair dealing inherent in the termination provision of the franchise agreements by falsifying a basis on which to terminate the agreements. In reply, Liberty relies on the arguments set forth in its motion.

In Virginia, to establish a common law claim for breach of contract, a claimant must allege: "(1) a legally enforceable obligation of [counter defendant to counter claimant], (2) the [counter defendant's] violation or breach of that obligation, and 3) injury or damage to the [counter claimant] caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323, 770 S.E.2d 491, 493 (2015) (quoting *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)); *see also Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 613 (E.D. Va. 2010), *aff'd sub nom. Signature Flight Support Cor. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776 (4th Cir. 2011).

For a breach of contract to be actionable, the claimant must establish a *material* breach. *See Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1081–82 (E.D. Va. 2011) (citing *Horton v. Horton*, 254 Va. 111, 115, 487 S.E.2d 200 (1997)). "A material breach is a failure to comply with a fundamental aspect of the contract, so that the failure to perform that obligation defeats an essential purpose of the contract." *Id.*; *see also Elite Ent., Inc. v. Khela Bros. Ent. Inc.*, 396 F. Supp. 2d 680, 693 (E.D. Va. 2005) ("A material breach of contract occurs if a party fails to do something that he is bound to do according to the contract and that is so important and central to the contract that the failure defeats the very purpose of the contract.") (citing *Horton*, 254 Va. at 115, 487 S.E.2d 200, 204 (1997)).

In Virginia, every contract contains an implied covenant of good faith and fair dealing.

11

*Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) (citing *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541–42 (4th Cir. 1998)). "[I]n Virginia, as elsewhere, although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." *Id.* (internal brackets omitted). This duty prohibits the "exercise [of] contractual discretion in bad faith," but "does not prevent a party from exercising its explicit contractual rights." *Jennings v. RoundPoint Mortg. Servicing Corp.*, No. 2:17CV427, 2017 WL 8893606, at *3 (E.D. Va. Dec. 22, 2017), *report and recommendation adopted*, 2018 WL 1065107 (E.D. Va. Feb. 27, 2018) (quoting *Va. Vermiculite, Ltd.*, 156 F.3d at 542). "Further, 'a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action.'" *Johnson v. Countrywide Home Loans, Inc.*, No. 2:15cv513, 2016 WL 7042944, at *3 (E.D. Va. Jan. 26, 2016), *aff'd*, 669 F. App'x 117 (4th Cir. 2016) (quoting *Bagley v. Wells Fargo Bank, N.A.*, No. 3:12cv617, 2013 WL 350527, at *6 (E.D. Va. Jan. 29, 2013)).

Taking the allegations as true, the court finds the Serbuses have sufficiently alleged the elements of a plausible breach of contract claim against Liberty. The Serbuses allege that Liberty owed them a duty of good faith and fair dealing in the termination provision of each franchise agreement (Counterclaim at ¶ 74, DE 38); by terminating the franchise agreements pursuant to Section 8(b)(iii),[2] Liberty acted in bad faith by falsely accusing the Serbuses of wrongdoing and

---

[2] Section 8(b)(iii) states in pertinent part:

Liberty may terminate this Agreement without notice and the opportunity to cure for any of the following reasons . . . if we determine that you, or someone acting under your supervision and control, has committed a material violation of any law, ordinance, rule or regulation of a governmental agency or department reasonably associated with the operation of the Franchised Business, [or] committed any act or that is or could be, in Liberty's determination, harmful, prejudicial or injurious to the Liberty brand or any of the Affiliated Companies or any employee, franchisee, area developer or agent of such companies . . . .

12

"appropriat[ing] to itself all profits generated from [the Serbuses'] tax preparation stores" (*id.* at ¶ 70); and the Serbuses suffered "loss in an amount in excess of "$75,000.00" (*id.* at ¶ 75).[3] The court also finds the alleged breach *material* in that Liberty's alleged failure to comply with its contractual duty to act in good faith is "so important and central to the contract that the failure defeats the very purpose of the contract." *Elite Ent., Inc.*, 396 F. Supp. 2d at 693.

In addition, the Serbuses allege that Liberty has failed to pay fees owed in the approximate amount of $415,758 pursuant to the Automatic Payment Transfer provision of the franchise agreements and failed to pay the Serbuses for (or return) their tangible personal property Liberty seized following termination of the agreements pursuant to section 9(a) and 11 of the agreements. Taking them as true, the court finds the Serbuses' factual allegations are sufficient to adequately plead a plausible breach of contract claim. Liberty's motion is denied with respect to the Serbuses' first counterclaim.

2.      *Tort Claims* – Counterclaims Two through Five

Liberty contends that the tort claims alleged in counterclaims two through five are barred by the economic loss rule or, otherwise, fail to state plausible claims for relief under Virginia and North Carolina law. In response, the Serbuses concede that claims two, four, and five should be considered under Virginia law, but contend that claim three, alleging a violation of a North Carolina statute, should be considered under North Carolina law. Liberty replies that, based on their concession, the Serbuses should have filed an amended pleading but, even if the court considers the claims under Virginia law, claims two, four, and five should be dismissed. The court

Franchise Agreement, DE 9-2 at 16.
[3] The Serbuses also allege that "[b]y wrongfully terminating [the Serbuses'] franchise agreements at the end of February 2021, Liberty destroyed the future value of the franchises to [the Serbuses], which by Liberty's own calculation is in excess of $2.5 million." *Id.* at ¶ 61.

13

finds, based on the Serbuses' concession, that claims two, four, and five must be considered under Virginia law and, therefore, construes the Counterclaim (which references "North Carolina common law" only in the titles of each cause of action) as such. Further, the court finds, based on the reply brief,[4] Liberty has abandoned its argument that claim three, alleging a violation of North Carolina's Unfair or Deceptive Trade Practices Act, should be considered under Virginia law and, thus, will proceed to determine whether it states a plausible claim under North Carolina law.

a.    Unfair or Deceptive Trade Practices Act – Counterclaim Three

The North Carolina Unfair or Deceptive Trade Practices Act (UDTPA) is "meant to prevent 'unfair or deceptive acts or practices in or affecting commerce.'" *Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012) (quoting *Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 561 S.E.2d 905, 910 (2002)). To state a claim under the UDTPA, a claimant must show "(1) defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the [claimant]." *Id.*

The Serbuses allege that "Liberty's misappropriation of [the Serbuses'] tax preparation franchises for its own profit, seizure of [the Serbuses'] property without compensation, and defamation of [the Serbuses] in the community, constitute an unfair or deceptive scheme to steal [the Serbuses'] businesses . . . ." Countercl., ¶ 84. Liberty argues that the economic loss rule bars this claim and, otherwise, the Serbuses fail to allege a plausible unfair or deceptive act or practice.

In North Carolina, the economic loss rule provides that "[o]rdinarily, a breach of contract

---

[4] Liberty argues, "[w]hen taking all of the relevant facts central to the claims into consideration, it is apparent that each of Defendants' claims is insufficiently pled, and the Counterclaim should therefore be dismissed." Reply, DE 61 at 2. However, in arguing that the Serbuses' "tort" claims fail to state plausible claims under Virginia law, Liberty repeatedly references these claims as "common law claims" and specifically identifies claims two, four, and five in its argument. *Id.* at 1-5. Liberty also argues that claims one and six should be dismissed but does not mention claim three in the reply brief. *See id.*

does not give rise to a tort action by the promisee against the promisor." *Ellis*, 699 F.3d at 783 (quoting *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345, 350 (1978), *rejected on other grounds by Trustees of Rowan Tech. v. Hammond Assoc.*, 313 N.C. 230, 328 S.E.2d 274 (1985)). Thus, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 164 (4th Cir. 2018) (quoting *Rountree v. Chowan Cty.*, 252 N.C. App. 155, 160, 796 S.E.2d 827, 830 (N.C. App. 2017)). In other words, a "tort action must be grounded on a violation of a *duty* imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties." *Rountree*, 252 N.C. App. at 160, 796 S.E.2d at 831 (citing *Asheville Contracting Co. v. City of Wilson*, 62 N.C. App. 329, 342, 303 S.E.2d 365, 373 (1983)).

Liberty cites the 2016 opinion in *Bradley Woodcraft, Inc. v. Bodden* in support of its argument that the economic loss rule bars the Serbuses' UDTPA claim. See Mot., DE 43 at 12 (citing 251 N.C. App. 27, 32, 795 S.E.2d 253, 257 (2016)). However, the *Bodden* court addressed only whether the rule applies to a fraud claim: "we hold that . . . while claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, ***claims for fraud*** are not so barred . . . .'" *Bodden*, 251 N.C. App. at 34, 795 S.E.2d at 259 (emphasis added). *Bodden* did not address application of the rule to a UDTPA claim. *See id.* Moreover, the Fourth Circuit in 2012 noted that "the North Carolina courts have never addressed whether UDTPA claims are subject to the [economic loss rule], and in the absence of such direction, we are well-advised to rely on other grounds." *Ellis*, 699 F.3d at 787 n.5 (citing *Time Warner Entm't–Advance/Newhouse P'ship v. Carteret–Craven Elec. Membership Corp.*, 506 F.3d 304, 315 (4th Cir. 2007) ("[A]s a court sitting in diversity, we should not create or extend the North Carolina

15

common law[.]")).  In a recent opinion, this court cited *Ellis* in deferring a ruling on whether the economic loss rule applied to bar a UDTPA claim.  *See Diop v. BMW of N. Am., LLC*, 511 F. Supp. 3d 679, 687 (E.D.N.C. 2021); *but see Dillon v. Leazer Grp., Inc.*, 374 F. Supp. 3d 547, 559 (E.D.N.C. 2019) ("all of the grounds asserted in the complaint for plaintiff's tort claims [including a UDTPA claim] render such claims barred by the economic loss rule").  The court has not found, and the parties do not cite, a North Carolina court's opinion addressing the application of the economic loss rule to a UDTPA claim.  Thus, the court will decline to rule on the issue[5] and, as in *Ellis*, will proceed to determine whether the Serbuses have stated a plausible claim under the UDTPA.

The UDTPA prohibits "unfair or deceptive" acts or practices. N.C. Gen. Stat. § 75–1.1(a). That language "generally covers five broad categories of conduct: 1) unfair conduct, 2) deceptive misrepresentations, 3) anti-competitive conduct, 4) certain per se violations of the statute, and 5) breaches of contract occurring under aggravating circumstances." *Sparks v. Oxy–Health, LLC*, 134 F. Supp. 3d 961, 997–98 (E.D.N.C. 2015).  This court finds the conduct alleged by the Serbuses implicates the first and fifth categories.

Conduct is "unfair" when it "offends public policy ... [or] is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F. Supp. 3d 1011, 1022 (E.D.N.C. 2015), *aff'd*, 674 F. App'x 250 (4th Cir. 2016) (quoting *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72, 653 S.E.2d 393 (2007)).  Accordingly, "a plaintiff must show the act 'possessed the tendency or capacity to mislead, or created the likelihood of deception'; deliberate acts of bad faith or deceit are not necessary." *Emert v. Smith*, 261 N.C. App. 115, 817 S.E.2d 629, 2018 WL 3978152, at *4 (Aug. 21, 2018) (citing *Forsyth Mem'l Hosp.*

---

[5] The court denies Liberty's motion without prejudice in this regard.

16

*v. Contreras*, 107 N.C. App. 611, 614, 421 S.E.2d 167, 170 (1992), *disc. review denied*, 333 N.C. 344, 426 S.E.2d 705 (1993)).

With respect to the fifth category, "unfairness or 'deception either in the formation of the contract or in the circumstances of its breach' may establish the existence of substantial aggravating circumstances sufficient to support an unfair and deceptive trade practices claim. *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020) (quoting *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535 (4th Cir. 1989)); *see also Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 217, 646 S.E.2d 550, 558 (2007) ("Mere breach of contract is not sufficient to sustain an action for UDTP, but if the breach is surrounded by substantial aggravating circumstances, it may sustain an action for UDTP.") (citing *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700, *disc. review denied*, 332 N.C. 482, 421 S.E.2d 350 (1992)). North Carolina courts have held that when a defendant forged a bill of sale to attempt to extinguish the plaintiff's ownership interest in a bulldozer and lied for three years to deprive the plaintiff of money owed under a contract, the defendant's actions were sufficient to sustain a claim under the UDTPA (*see Garlock v. Henson*, 112 N.C. App. 243, 246, 435 S.E.2d 114, 115 (1993)) and evidence that a defendant kept the plaintiff's down payment for seven months and falsely claimed that the purchased vehicle would be delivered shortly although it had not been ordered supported a claim under the UDTPA (*see Foley v. L & L Int'l*, 88 N.C. App. 710, 714, 364 S.E.2d 733, 736 (1988)).

The Fourth Circuit instructs that "[w]hether conduct is 'unfair' or 'deceptive' is a legal issue for the court to decide." *Ellis*, 699 F.3d at 787 (citing *Gilbane Bldg. Co. v. FRB*, 80 F.3d 895, 902 (4th Cir. 1996)). The *Ellis* court also addressed a UDTPA claim in the context of a breach of contract action and noted, "[w]e are mindful that a mere breach of contract claim 'is not unfair

17

or deceptive, . . . absent substantial aggravating circumstances.'" *Id.* (quoting *Gilbane*, 80 F.3d at 903). Further, the North Carolina Court of Appeals explains,

> Egregious or aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect. Aggravating circumstances include conduct of the breaching party that is deceptive. Finally, in determining whether a particular act or practice is deceptive, its effect on the average consumer is considered.

*Id.* (quoting *Becker*, 561 S.E.2d at 910–11).

In this case, the court finds the Serbuses allege substantial aggravating circumstances sufficient to state an unfair act under the UDTPA. While the Serbuses allege the same conduct supporting the UDTPA claim as that supporting the breach of contract claim (*compare* Countercl. ¶ 84 *with* ¶¶ 70-74),[6] the circumstances alleged here are different than that in *Ellis*, where the court found the alleged "unfair or deceptive acts" were simply a "re-couching" of a breach of warranty claim and insufficient to constitute a "substantial aggravating circumstance." *See Ellis*, 699 F.3d at 787. Here, the Serbuses allege that "as a result of the success of [the Serbuses'] business, the unsubstantiated fear that [the Serbuses] would attempt to leave Liberty to do business with a competitor, and Liberty's failure to contain a serious breach of security in its own tax software, Liberty determined to seize [the Serbuses'] franchises for its own gain and to cover up its mistakes." Countercl. at ¶ 35. The Serbuses contend that Liberty engaged in a "sham investigation" on "false" accusations by Liberty's compliance officer based on "anonymous calls from Defendant's employees," that Liberty "never made a sincere effort to investigate the truthfulness of the allegations" and that, based on the allegations, Liberty terminated the franchise

---

[6] While the law cited herein may support an argument that the same allegations for both claims demonstrate the UDTPA claim should be barred by the economic loss rule, the North Carolina Supreme Court recently noted, "In the event that the same act or transaction supports a claim for both breach of contract and unfair or deceptive trade practices, 'damages may be recovered either for the breach of contract, or for violation of [N.C.G.S. § 75-1.1].'" *SciGrip, Inc. v. Osae*, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020) (citation omitted).

agreements "without any notice or opportunity to cure." *Id.* at ¶¶ 36-44.

Liberty argues that the "the 'fundamental purpose' of this law 'is to protect the consumer, and courts invariably look to that purpose in deciding whether the Act applies." Mot., DE 43 at 13 (quoting *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999)). The court in *Food Lion* found that the alleged deceptive act—a misrepresentation in a job application made to further the production of a news show that sought to uncover "unwholesome food handling practices"—"did not harm the consuming public." *See id.* Construing Liberty's citation as an argument that the Serbuses' allegations fail to demonstrate proper application of the UDTPA, the court finds the Serbuses plausibly allege harm to consumers. It is undisputed that Liberty sells franchises to the public and the Serbuses purchased franchises from Liberty; taking the Serbuses' allegations as true, Liberty can be said to have harmed the consuming public by falsely accusing its franchisees of potentially criminal conduct in an effort to take over their successful businesses. Surely, customers have an interest in an accurate determination of whether taxes were filed by authorized individuals. The court concludes that the Serbuses' allegations supporting its third counterclaim are sufficient to state a plausible claim under the UDTPA.

b.       Common Law Torts—Counterclaims Two, Four, and Five

The Serbuses allege claims for defamation, conversion, and intentional interference with business advantage; as set forth above, the court construes and analyzes these claims under Virginia law.

(1)      Economic Loss Rule

In Virginia, the "losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts." *Filak v. George*, 267 Va. 612, 618, 594 S.E.2d 610, 613 (2004); *see also Tingler v. Graystone*

*Homes, Inc.*, 298 Va. 63, 834 S.E.2d 244, 255 (2019) ("'to recover in tort, the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract.'") (quoting *MCR Fed., LLC v. JB & A, Inc.*, 294 Va. 446, 458, 808 S.E.2d 186 (2017)). Virginia characterizes this doctrine as the source-of-duty rule. *See Tingler*, 298 Va. at 82, 834 S.E.2d at 255 ("No matter the alleged harm, tort liability cannot be imposed upon a contracting party for failing to do a contractual task when no common-law tort duty would have required him to do it anyway....").

The economic loss doctrine "serves as a remedy-specific application of the source-of-duty rule." *Id.* at 264 (citing *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 360-61, 699 S.E.2d 483 (2010)). Under this doctrine, "claims for 'damages which were within the contemplation of the parties when framing their agreement remain the particular province of the law of contracts." *Id.* at 264-65 (internal quotation marks and citation omitted); *see also Filak*, 267 Va. at 618, 594 S.E.2d at 613 ("when a plaintiff alleges and proves nothing more than disappointed economic expectations assumed only by agreement, the law of contracts, not the law of torts, provides the remedy for such economic losses." (citing *Willard v. Moneta Bldg. Supply, Inc.*, 262 Va. 473, 480, 551 S.E.2d 596, 599 (2001)). "These legal principles establish when tort claims, contract claims, or both may be brought under Virginia law." *Selective Ins. Co. of the Se. v. Williamsburg Christian Acad.*, 458 F. Supp. 3d 409, 414 (E.D. Va. 2020).

With respect to the Serbuses' conversion claim, "the Supreme Court of Virginia has stated that '[a] cause of action for conversion lies independent of an action in contract and may provide a separate basis, distinct from the contract upon which one [party] may sue another.'" *KCE Properties, Inc. v. Holy Mackerel, Inc.*, No. 4:16CV42, 2016 WL 6496441, at *2 (E.D. Va. Oct. 31, 2016) (quoting *PGI, Inc. v. Rathe Prods., Inc.*, 265 Va. 334, 344, 576 S.E.2d 438, 443 (2003)).

Relevant here, Virginia has recognized that an alleged seizure of property occurring *after* a contract has been terminated sounds in tort rather than in contract. *Id.* (citing *Condo. Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 574, 709 S.E.2d 163, 171 (2011) (holding that because the parties' contract had terminated before the defendant exercised dominion over the funds at issue, the "alleged acts did constitute the 'independent, willful tort' of conversion")). Here, the Serbuses allege, "Liberty intentionally engaged in an unauthorized assumption and exercise of the right of ownership over [the Serbuses'] property by wrongfully terminating [the Serbuses'] franchises, changing the locks to [the Serbuses'] tax preparation stores, and refusing to allow [the Serbuses] to reclaim their personal property." Countercl. at ¶ 89.[7] The court finds consistent with *PGI, Inc.* and *Condo. Servs.* that the Serbuses' counterclaim of conversion is not barred by the source-of-duty rule or economic loss doctrine.

Likewise, the Serbuses' defamation claim arises outside of the contractual relationship and is not barred. The Serbuses allege that "Liberty falsely accused [the Serbuses] of unlawfully directing their employees to file tax returns without proper identification with the Internal Revenue Service, providing unacceptable work conditions, and failing to adhere to its Franchise Agreements" and "Liberty published the foregoing false statements to third parties, including without limitation the landlords with which [the Serbuses] did business, [the Serbuses'] former employees, and members of the Jacksonville, Havelock, and Wilmington communities." Countercl. at ¶¶ 77, 80. The court finds Liberty's duty to refrain from publishing false statements of fact about the Serbuses exists in Virginia's common law. *See Jordan v. Kollman*, 269 Va. 569,

---

[7] Liberty argues that the Serbuses reference the franchise agreements in the conversion claim and, thus, it is "disingenuous" to argue that the claim arises under tort, not contract, law. The court is not persuaded; the Serbuses' citation to the agreements is found in its *alternative* allegation that "Liberty has failed to perform under [the agreements'] option by paying [the Serbuses] for the personal property." *See* Countercl. at ¶ 90.

21

575, 612 S.E.2d 203, 206 (2005) (listing the elements necessary to prove a defamation claim in Virginia). Thus, the economic loss rule does not bar the Serbuses' claim.

Finally, the Serbuses allege that Liberty's improper "seizure" of their franchise operations tortiously interfered with their ability to earn income by preparing tax returns for their customers. This is a closer call, but the court also finds this claim survives the economic loss rule. *See Goodrich Corp. v. BaySys Techs., LLC*, 873 F. Supp. 2d 736, 747 (E.D. Va. 2012) ("A party can, in certain circumstances, show both a breach of contract and a tortious breach of duty.") (quoting *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 507 S.E.2d 344, 347 (1998)). The Serbuses allege that it was Liberty's improper "seizure" of its franchises, not simply the termination of the agreements, that caused the Serbuses' damages. Taking these allegations as true, the court finds Liberty's conduct in terminating the Serbuses' contracts, appropriating the Serbuses' business property, and taking over their successful business operations for Liberty's own gain suffices to demonstrate a duty that arises from Virginia's common law, not just the contracts. *See id.* ("Under Virginia law, a tort claim normally cannot be maintained in conjunction with a breach of contract claim. An exception arises where a party establishes an independent, willful tort that is factually bound to the contractual breach but whose legal elements are distinct from it." (quoting *Erdmann v. Preferred Research, Inc.*, 852 F.2d 788, 791 (4th Cir. 1988)).

The court concludes that the source-of-duty rule and economic loss doctrine do not bar the Serbuses' common law tort claims as alleged; thus, Liberty's motion is denied in this regard. *See Derrick v. Lincoln Nat'l Life Ins. Co.*, No. 6:18-CV-00085, 2020 WL 4352758, at *5 (W.D. Va. July 29, 2020) ("if, when the surface is scratched, it appears that the defendant has breached a duty imposed by law, not by contract, the economic loss rule should not apply.") (quoting *Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 446 (4th Cir. 1990)).

22

(2)     Failure to State a Claim

Liberty asserts that the Serbuses fail to state plausible claims for defamation, conversion, and tortious interference under Virginia law.

For the defamation claim, Liberty contends that the Serbuses must allege the "exact words" used by Liberty to state a plausible claim. The Serbuses counter that they have, indeed, alleged the exact words used to defame them; however, "[u]nder federal standards, a plaintiff may, but need not, state the exact words spoken by the defendant to maintain a cause of action for defamation." *Nedrick v. Southside Reg'l Med. Ctr.*, No. 3:19CV202, 2020 WL 534052, at *6 n.10 (E.D. Va. Feb. 3, 2020) (citing *Doe v. Roe*, 295 F. Supp. 3d 664, 678 (E.D. Va. 2018) (finding that "Virginia pleading standards are not controlling [in a case filed in the Eastern District of Virginia]; rather it is Rule 8 [of the Federal Rules of Civil Procedure], that governs the outcome of [a] motion to dismiss.")). In this respect, Liberty argues that "[the Serbuses] do not identify any specific instances of defamation, nor . . . the time, place, speaker, or listener for any alleged defamatory statement." Mot., DE 43 at 10.[8] The court disagrees.

To state a plausible claim for defamation under Virginia law, a claimant must allege: (1) publication; (2) of an actionable statement; with (3) the requisite intent. *Meredith v. Nestle Purina Petcare Co.*, 516 F. Supp. 3d 542, 548 (E.D. Va. 2021) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). Actionable statements must (1) "contain a provably false factual connotation," *Yeagle v. Collegiate Times*, 255 Va. 293, 497 S.E.2d 136, 137 (1998), and (2) "carry

---

[8] The case Liberty cites for this proposition is an unpublished Fourth Circuit opinion addressing an otherwise untimely claim and whether it "relates back" to the original complaint under Rule 15(c) of the Federal Rules of Civil Procedure. *See English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 172 F.3d 862, 1999 WL 89125, *3 (4th Cir. 1999). The *English Boiler* court cites a North Carolina Court of Appeals decision for the proposition proffered by Liberty. *See id.* (citing *Gibson v. Mutual Life Ins. Co.*, 121 N.C. App. 284, 465 S.E.2d 56, 58 (1996)).

23

the requisite defamatory sting to one's reputation," *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 507 (E.D. Va. 2016). Accordingly, "[s]tatements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false." *Dragulescu*, 223 F. Supp. 3d at 507. Moreover, "[d]efamatory words are those 'tend[ing] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* (quoting *Schaecher v. Bouffault*, 290 Va. 83, 92, 772 S.E.2d 589 (2015). Finally, "[w]here public officials are not involved, the requisite intent [for defamation] in Virginia is negligence. *Id.* at 508 (quoting *Gazette, Inc. v. Harris*, 229 Va. 1, 15, 325 S.E.2d 713 (1985)).

The Serbuses allege that "Liberty falsely accused [the Serbuses] of unlawfully directing their employees to file tax returns without proper identification with the Internal Revenue Service, providing unacceptable work conditions, and failing to adhere to its Franchise Agreements"; "Liberty published the foregoing false statements to third parties, including without limitation the landlords with which [the Serbuses] did business, [the Serbuses'] former employees, and members of the Jacksonville, Havelock, and Wilmington communities"; and "Liberty was negligent in making such statements against [the Serbuses]." Countercl. at ¶¶ 77, 80-81. The court finds these allegations, taken as true, sufficient to state a plausible claim for defamation: the allegedly false statements can be proved either true or false, they were published to certain third persons with whom the Serbuses worked and/or conducted business, and Liberty was negligent in making these statements.

Regarding the conversion claim, the Serbuses must allege "the ownership or right to possession of the property at the time of the conversion and . . . the [plaintiff's] conversion by the wrongful exercise of dominion or control over the [the Serbuses'] property, depriving [them] of

24

possession." *Acken v. Kroger Co.*, 58 F. Supp. 3d 620, 633 (W.D. Va. 2014) (quoting *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 518 (E.D. Va. 2001), *aff'd*, 63 F. App'x 630 (4th Cir. 2003)). The Serbuses allege they "owned various goods and personal chattels that they used as part of their tax preparation business. These goods and chattels include, without limitation, office equipment (such as computers, phone systems, printers), furniture, appliances, and other items." Countercl. at ¶ 88. The Serbuses continue, "Liberty intentionally engaged in an unauthorized assumption and exercise of the right of ownership over [the Serbuses'] property by wrongfully terminating [the Serbuses'] franchises, changing the locks to [the Serbuses'] tax preparation stores, and refusing to allow [the Serbuses] to reclaim their personal property." *Id.* at ¶ 89.

Other than its arguments regarding application of the source-of-duty and economic loss rules, Liberty contends that the Serbuses' claim fails to the extent it is based not on tangible property but on Liberty's termination of the contracts. Mot. DE 43 at 15-16. The Serbuses counter that their allegations sufficiently identify tangible property allegedly appropriated by Liberty. The court agrees; the Serbuses allege both possession of tangible property and that Liberty not only prohibited the Serbuses' access to the property but also has refused to return it. The Serbuses' fourth counterclaim states a plausible claim of conversion.

Finally, to state a plausible claim for tortious interference with contract or prospective economic advantage, the Serbuses must allege (1) "the existence of a business relationship or expectancy, with a probability of future economic benefit," (2) that Liberty had "knowledge of the relationship or expectancy," (3) "that it was reasonably certain that absent intentional misconduct, the claimant would have continued in the relationship or realized the expectancy," and (4) "that [the Serbuses] suffered damages from the interference. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 297 (4th Cir.), *cert. denied*, 142 S. Ct. 483, 211 L. Ed. 2d 293 (2021) (quoting

*Com. Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001) (applying Virginia law)). Liberty contends that the Serbuses fail to allege the first element because, under Virginia law, the "expectancy of remaining in business is too general to support a tortious interference claim" but, rather, there "must be a particular expectancy which [claimant] is reasonably certain will be realized." Mot., DE 43 at 18 (quoting *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003)). Liberty also asserts that the Serbuses fail to allege that it employed "improper methods." *Id.* at 18-19 (quoting *Maximus, Inc. v. Lockheed Info. Sys., Inc.*, 254 Va. 408, 413, 493 S.E.2d 375, 378 (1997)).

The court finds the Serbuses have stated a plausible claim of tortious interference with prospective business advantage. The Serbuses allege that they entered into several franchise agreements with Liberty from December 2015 through December 2017; in the year prior to February 2021, their gross receipts total for all franchises was approximately $1.3 million; and a Liberty official "described [the Serbuses'] franchises as 'one of the most well run organizations' Liberty worked with." Countercl. at ¶¶ 16, 20-21. Further, the Serbuses allege

93. As part of their tax preparation business, Defendants expected to prepare tax returns for customers in and around the Jacksonville, Havelock, and Wilmington communities.

94. Customers throughout these communities specifically sought to have their tax returns prepared by Defendants. Many customers returned year after year to have their returns prepared at Defendants' franchises.

95. By seizing Defendants' tax preparation franchises, Liberty deprived Defendants of the opportunity to contract with prospective customers for the preparation of their tax returns.

96. But for Liberty's seizure of Defendants' tax preparation franchises, Defendants would have contracted with numerous prospective customers for the preparation of their tax returns

97. Liberty's seizure of Defendants' franchises, which was intended to exclude Defendants from tax preparation for Liberty's gain, was malicious.

26

98. Liberty had no justification to prevent Defendants from pursuing their tax preparation business.

Countercl., DE 38. These allegations demonstrate that the Serbuses did not simply expect to remain in business but expected to serve its returning customers and to meet or exceed its successful income. Further, as set forth above, the Serbuses allege that Liberty's "seizure" of their businesses was accomplished by falsely accusing them of unlawful conduct for the purpose of covering up its own misconduct and obtaining the franchises for its own gain. Thus, the Serbuses meet the requirement to allege Liberty engaged in "improper methods."

     D.    Conclusion

The court concludes that the Serbuses have conceded that their independent claim for "punitive damages" is improper and, thus, the court GRANTS IN PART Liberty's motion to dismiss the Serbuses' sixth counterclaim. The court also finds the Serbuses plausibly state counterclaims one, two, four, and five under Virginia law, and counterclaim three under North Carolina law and, therefore, DENIES IN PART Liberty's motion to dismiss these claims. The Serbuses are ORDERED to file an Amended Counterclaim re-alleging claims two, four, and five under Virginia law in accordance with this order on or before March 21, 2022.

**II.    Motion to Strike**

Pursuant to Rules 12(f) and 39(a)(2) of the Federal Rule of Civil Procedure, Liberty moves to strike the Serbuses' jury demand in their Counterclaim. Rule 39(a)(2) provides that:

> (a) When a Demand Is Made. When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury unless:
> ***
> (2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.

Fed. R. Civ. P. 39(a). Federal courts have held that the right to a jury trial is procedural under *Erie*

*R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) and, therefore, the right is controlled by and analyzed under federal law. *See Simler v. Conner*, 372 U.S. 221, 221 (1963) ("[F]ederal law governs in determining the right to a jury trial in the federal courts."). The Fourth Circuit has ruled that the Seventh Amendment of the United States Constitution guarantees the right to a jury trial in civil cases, but parties to a contract may waive this right by prior written agreement. *Leasing Serv. Corp. v. Crane*, 804 F.2d 828, 832 (4th Cir. 1986). The "party seeking enforcement of the waiver must prove that consent was both voluntary and informed." *Id.* at 833; *see also Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cty, N.C.*, 149 F.3d 277, 280 (4th Cir. 1998) ("The contractual waiver of a constitutional right must be a knowing waiver, must be voluntarily given, and must not undermine the relevant public interest in order to be enforceable.").

The franchise agreements at issue in this case contain the following waiver:

**c. Jury Waiver.** In any trial between you and any or all of the Liberty Parties, that in any way relates to or arises out of this Agreement or any of the dealings between you and any or all of the Liberty Parties, you and Liberty waive the rights to a jury trial and agree to have such action tried by a judge.

Agreement at ¶ 17(c), DE 9-2. In the present motion, Liberty cites the Fourth Circuit's opinion in *Leasing Serv. Corp.* to argue that the court should strike the Serbuses' demand for a jury trial (set forth in the Counterclaim) based on the contractual waiver. Citing opinions from the Ninth Circuit and the Middle District of Georgia, the Serbuses respond that while the right to a jury trial arises under federal law, a court sitting in diversity "should adopt state law as a federal rule of decision when interpreting the validity of a jury trial waiver" and, in this case, the court should adopt N.C. Gen. Stat. § 22B-10, which renders unenforceable any contractual provision that requires a party to waive his or her right to a jury trial. Resp., DE 59 at 4, 8-10. This court finds that, even if it

28

were inclined to consider the Serbuses' theory,[9] the court is bound by the Fourth Circuit's opinion in *Leasing Serv. Corp.*

A decision by a circuit court is binding on the district courts in that circuit. *Fisher-Borne v. Smith*, 14 F. Supp. 3d 695, 697 (M.D.N.C.), *objections overruled*, 14 F. Supp. 3d 699 (M.D.N.C. 2014) (citing *Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 970 (3d Cir. 1979) ("A decision by this court, not overruled by the United States Supreme Court, is a decision of the court of last resort in this federal judicial circuit."), *abrogated on other grounds*, *St. Margaret Mem'l Hosp. v. N.L.R.B.*, 991 F.2d 1146, 1152 (3d Cir. 1993)); *see also Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 642 (4th Cir. 1975) ("[A] decision [of this Court] is binding, not only upon the district court, but also upon another panel of this court—unless and until it is reconsidered en banc."); *United States v. Brown*, 74 F. Supp. 2d 648, 652 (N.D. W.Va. 1998) ("[A] district court is bound by the precedent set by its Circuit Court of Appeals, until such precedent is overruled by the appellate court or the United States Supreme Court."). In *Leasing Serv. Corp.*, the Fourth Circuit addressed cross appeals "from a [North Carolina district court's] judgment rendered in a *diversity action* involving a disputed lease of drilling equipment." *Leasing Serv. Corp.*, 804 F.2d

---

[9] Specifically, the Serbuses assert that N.C. Gen. Stat. § 22B-10, which renders unenforceable any contractual provision that requires a party to waive his or her right to a jury trial, should supply the federal rule of decision in this matter. In so arguing, the Serbuses ask the court to follow the Ninth Circuit's opinion in *In re Cnty. of Orange*, 784 F.3d 520 (9th Cir. 2015), which concluded that California provided a more protective jury waiver rule than the Seventh Amendment and thus, it was "a classic case for adopting, as the federally prescribed rule of decision, the law that would be applied by state courts *in the State whose law governs the contract.*" *Id.* at 531 (citation and internal quotation marks omitted) (emphasis added). However, the Serbuses do not agree that the state whose law governs the agreements in this case, Virginia, should apply; rather, the Serbuses contend that North Carolina's choice of law rules should determine which state's law should be used to interpret the agreements' jury waiver. The court finds the Serbuses' position in this regard inconsistent with their concession that their contractual and common law tort claims should be brought and analyzed under Virginia law, purportedly in recognition of the choice-of-law provision in the franchise agreements. *See* Resp. at 21 n.3, DE 58.

29

at 829 (emphasis added). The court applied *federal* law to determine whether the contractual jury trial waiver was enforceable. *Id.* at 832-33 ("Where waiver is claimed under a contract executed before litigation is contemplated, we agree with those courts that have held that the party seeking enforcement of the waiver must prove that consent was both voluntary and informed.") (citing *Nat'l Equip. Rental Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977)). The Serbuses' request that the court apply *state* law in this diversity action to determine whether the franchise agreements' jury trial waiver is enforceable contravenes *Leasing Serv. Corp.[10]* and, thus, fails.

Under prevailing law, a challenge to a contractual jury trial waiver in the Fourth Circuit must allege that the waiver was either uninformed or involuntary or is otherwise invalid. *See id.* The Serbuses do not make such challenges here, and the court finds nothing in the franchise agreements that may question the validity of the waiver. *See JTH Tax, Inc. v. Frashier*, No. 2:09CV40, 2009 WL 10689306, at *3 (E.D. Va. Apr. 15, 2009) ("It is well-established that a party to a franchise agreement may waive the right to a jury trial.") (citing *Smith-Johnson Motor Corp. v. Hoffman Motors Corp.*, 411 F. Supp. 670, 675-77 (E.D. Va. 1975) (upholding jury trial waiver in franchise agreement)). Therefore, Liberty's motion to strike is granted and the Serbuses' demand for a jury trial is stricken.

## III. Motion for Show Cause Order

The Serbuses seek an order requiring Liberty to show cause why it should not be held in contempt for failing to comply with the Consent Order for Preliminary Injunction, issued by this court on March 23, 2021. DE 33. Liberty counters that it has substantially complied with the

---

[10] The Serbuses' contention that the Fourth Circuit has never had occasion to consider whether N.C. Gen. Stat. § 22B-10 applies, because the statute was implemented after *Leasing Serv. Corp.*, does not change the court's conclusion. The prevailing law in this circuit is that contractual jury trial waivers are governed by *federal* law.

30

requirements of the injunction and, thus, no order is necessary.

The Serbuses contend that Liberty failed to comply with the following provisions of the injunction:

> 1.     Defendants shall transfer the leases of each of the following locations to Liberty within three (3) days of the date of this Order:
>
> - Store No. 10388   345 West Boulevard, Jacksonville NC (NC044);
> - Store No. 15003 – 521 S. Yopp Rd., Jacksonville NC (NC046);
> - Store No. 17347 - 1128 Western Blvd., Jacksonville NC (NC046);
> - Store No. 10899 – 474 Hwy 70 W, Havelock NC (NC058);
> - Store No. 10736   415 S. College Rd., Wilmington NC (NC080);
> - Store No. 17433   2642 Carolina Beach, Wilmington NC (NC081);
> - Store No. 20587 – 5042 Market St., Wilmington NC (NC082); and
> - Store No. 13144 – 5202 Carolina Beach, Wilmington NC (NC083);
>
> (collectively, the "Locations"). Liberty agrees and will take all necessary steps to immediately assume the lease obligations for each of the Locations.
>
> 2.     Defendants shall take all steps reasonably necessary to transfer all telephone numbers associated with the Locations and shall take all steps reasonably necessary to transfer the utilities of the Locations into Liberty's name and control immediately. Liberty agrees and shall take all steps reasonably necessary to immediately effect the transfer of all telephone numbers associated with the Locations, and the transfer of the utilities of the Locations, including without limitation securing any necessary permits from local governments.

Order, DE 33 at 2. The Serbuses argue that Liberty failed to act "immediately" to assume the lease obligations, as required in paragraph 1, and its months-long delay left the Serbuses in the difficult position of "negotiat[ing] with the landlords in order to cut off [the Serbuses'] potential liability and secure the return of their deposits." Reply, DE 55 at 3. In addition, the Serbuses assert that Liberty's failure to take over utilities, as required in paragraph 2 of the injunction, has caused them to expend at least $1,161.54 in utility costs (to avoid damage to their credit) and to lose security deposits at two locations. Moreover, the Serbuses contend they have been required to "spend substantial time dealing with utility companies and landlords to try to take care of the transfers that

Liberty had promised to effect" and "have faced threats from utility companies to have their personal utilities cut off or to have their personal credit ruined." *Id.* at 5.

Liberty counters that it "has taken all available steps within its control to make [the required] transfers, and has in fact already transferred all leases and utilities, and did so during its busiest time of year." Resp., DE at 6. Liberty attached to its response brief a declaration from Dan Brashier, "Corporate Treasurer of AVP Treasury/Supply/Vendor Relations/Facilities" for Liberty, who attests that as of June 30, 2021 (more than three months after issuance of the injunction), Liberty had either arranged for the properties' leases to be transferred to Liberty's name or closed stores at certain properties. *See* Declaration of Dan Brashier, June 30, 2021 ("Brashier Decl."), at ¶¶ 4-11, DE 54-14. Mr. Brashier also attests that the utilities for all properties have been either transferred to Liberty's name or paid in full at the store's closing. *See id.* However, Mr. Brashier does not provide dates on which any of these actions occurred.

The Supreme Court declares, "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). "A court may impose sanctions for civil contempt 'to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy.'" *Cromer v. Kraft Foods North Am.*, 390 F.3d 812, 821 (4th Cir. 2004) (quoting *In re Gen. Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995)).

A party pursuing a finding of civil contempt bears the burden of proving the following elements by clear and convincing evidence: "(1) the existence of a valid court order; (2) the order was in the moving party's 'favor'; (3) a knowing violation of the terms of the order; and (4) the moving party suffered harm from the violation." *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454, 461-62 (4th Cir. 2020) (quoting *United States v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017)).

32

"Once the movant establishes these elements, the burden shifts to the non-movant to show 'good faith [in making] all reasonable efforts to comply with the [court] order.'" *Id.* If the non-movant fails to meet its burden, it may be held in civil contempt. *Id.*

The court finds by the evidence presented that it cannot determine whether Liberty has complied with the injunction. The Serbuses attest that they suffered harm due to Liberty's failure to "immediately" arrange for the transfers of the leases and utilities; however, the court requires additional information for context. Liberty appears to argue that the Serbuses have been made whole, but its declaration is unclear. Liberty declares that all transfers were completed by June 30, 2021—more than three months after the issuance of the preliminary injunction—but it does not reveal when and under what circumstances Liberty's transfer efforts were taken. Moreover, the briefing on this matter occurred during the summer 2021; the court currently has no knowledge as to who bears responsibility for the delays and who should be responsible for the costs.

Accordingly, the court orders that the parties file a joint supplemental brief providing the court with information (in the form of affidavits, declarations, or admissible documents) currently "missing" from the record, including that referenced above. If any dispute remains, the parties shall so state. The court will levy against a party any unnecessary costs caused by that party.

The parties shall file the supplemental brief no later than March 31, 2022. The court reserves judgment on the motion for order to show cause until such time as it receives and reviews the supplemental brief.

SO ORDERED this _4th_ day of March, 2022.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

33