IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:21-cv-22-BO-BM

JTH TAX LLC d/b/a LIBERTY TAX )
SERVICE f/k/a/ JTH TAX, INC., )
                                                 )
        Plaintiff, )
                                                 )
v. )           O R D E R
                                                 )
CMB TAX SERVICE, LLC, )
JEFFERY SERBUS, and )
CINDY SERBUS, )
                                                 )
        Defendants. )

This matter comes before the Court on cross-motions for summary judgment. Defendant moved for summary judgment [DE 181], plaintiff responded [DE 197], and defendant replied [DE 206]. Plaintiff moved for summary judgment [DE 186], defendant responded [DE 199], and plaintiff replied [DE 205]. Both parties filed statements of material facts [DE 107]; [DE 190]. A hearing was held before the undersigned on October 21, 2025, in Elizabeth City, North Carolina. In this posture, the motions are ripe for ruling. For the following reasons, plaintiff's motion for summary judgment is granted.

BACKGROUND

Plaintiff JTH Tax LLC does business as Liberty Tax Service (Liberty). Liberty is a franchise that provides tax preparation services. Defendant Jeffery Serbus is the registered agent and sole member of CMB Tax Service, LLC (CMB). In November of 1999, defendants Jeffery and Cindy Serbus and defendant CMB entered a franchise agreement with Liberty. [DE 190, ¶ 1]; [DE 200, ¶ 1]. Defendants opened their first Liberty office in 2000. *Id.* By the time this dispute arose

in 2020, the franchisees had expanded, operating nine successful tax preparation locations bearing Liberty's name. [DE 190, ¶ 3]; [DE 200, ¶ 3].

These nine locations covered ten of Liberty's "territories," and each territory was governed by its own franchise agreement. *Id.*; [DE 190, ¶ 12]; [DE 200, ¶ 12]. Between December 2015 and December 2017, the parties entered into the renewed franchise agreements that were in effect at the time this dispute arose. [DE 190, ¶ 14]; [DE 200, ¶ 14]. All the franchise agreements were substantially similar. *Id.*

Section 6 of the franchise agreements outlines the defendant franchisee's obligations. [DE 9-2]. Section 6(u) provides: "You agree to comply with all federal, state and local laws, regulations, ordinances and the like, and to be responsible for such compliance by all employees of the Franchised Business." *Id.* Section 8 regards termination of the agreement. Section 8(b) provides:

> Liberty may terminate this Agreement without notice and the opportunity to cure for any of the following reasons: . . . (iii) . . . if we determine that you, or someone acting under your supervision and control, has committed a material violation of any law, ordinance, rule or regulation of a governmental agency or department reasonably associated with the operation of the Franchised Business, committed any act that is or could be, in Liberty's determination, harmful, prejudicial or injurious to the Liberty brand or any of the Affiliated Companies or any employee, franchisee, area developer or agent of such companies . . .

*Id.* While the foregoing section 8(b) describes reasons for termination without notice to the franchisee or an opportunity to cure the defect, 8(c) describes reasons for which Liberty may terminate the agreement after giving notice and an opportunity to cure. Section 8(c) provides:

> Termination with Notice and Opportunity to Cure. No fewer than seven (7) days after Liberty has sent you notice of your opportunity to cure, Liberty may terminate this Agreement if: . . . (iii) You fail to comply with IRS standards applicable to e-file providers as stated in IRS Publications 3112, 1345 or another or successor IRS publication applicable to e-file providers or you fail to comply with state or local regulations related to electronic filing . . .

*Id.*

The IRS' electronic filing system, "e-file," allows taxpayers to submit their tax returns over the internet. When the IRS authorizes a business or organization to participate in its e-file program, it issues the entity an Electronic Filing Identification Number (EFIN). Such entities that submit returns on behalf of taxpayers are called Electronic Return Originators (EROs). Defendant Jeffrey Serbus was an ERO, and all the returns filed by the Serbus franchise locations were required to include his EFIN on the returns they filed. [DE 190, ¶ 26–28]; [DE 200, ¶ 26–28]. The IRS also issues Preparer Tax Identification Numbers (PTINs) to employees of those companies.

So, a business that prepares tax returns has its own number, called an EFIN. That business' employees who prepare tax returns have their own numbers, called PTINs. Both numbers must appear on all tax returns the business files on behalf of its clients.

Liberty offers loans in the form of promissory notes to its franchisees to help them meet operating costs that must be incurred at the beginning of the year before franchises have the opportunity to generate revenue by preparing tax returns. [DE 190, ¶ 35]; [DE 200, ¶ 35]. After the 2020 tax season concluded, in preparation for the 2021 season, CB Tax executed two promissory notes with Liberty that allowed CMB to borrow up to $209,149 from Liberty. [DE 190, ¶ 42]; [DE 200, ¶ 42]. Because a balance on these notes remains unpaid, Liberty asserts a claim against defendants to recover the $178,481.32 owed as of March 1, 2021, plus annual interest at the 12% rate set by the notes.

In December 2019, Liberty entered into a consent order with the United States Department of Justice in a case captioned *United States of America v. Franchise Group Intermediate L1, LLC d/b/a/ Liberty Tax Service*, Case No. 2:19-cv-00653-RAJ-DEM. [DE 187-3]. The purpose of the consent order was to prevent the "preparation of false or fraudulent tax returns at Liberty Tax Service Stores." *Id.* The consent order required Liberty to include in any future franchise

3

agreements a provision stating, "[n]o person who prepares or supervises the preparation of federal tax returns at Liberty Tax Service stores shall be permitted to undertake such activities unless such person has an active PTIN." *Id.* It also required Liberty to maintain a whistleblower program which would "encourage employees, franchisees, and franchisee employees to report suspected fraudulent activity." *Id.*

In January of 2021, Liberty discovered evidence of a scammer stealing Liberty customers' tax refunds. Liberty customers may elect to receive their tax refunds through what Liberty calls an "EZ Advance," which is a loan from Liberty secured by and paid with the customer's tax refund. The customer receives the refund in a prepaid debit card. [DE 190, ¶ 50]; [DE 200, ¶ 50]. Heather Lampron, a former manager for defendants, noticed that some of her customers' tax returns had been changed and submitted without her approval. [DE 190, ¶ 46]; [DE 200, ¶ 46]. She filed a report with Liberty indicating customers had their returns processed before Ms. Lampron had the opportunity to double check the returns and confirm they were ready. [DE 190, ¶ 48]; [DE 200, ¶ 48]. The tax returns had been altered to redirect the customers' refunds from their chosen method of receipt to an EZ Advance prepaid card in the hands of the scammer. [DE 190, ¶ 53]; [DE 200, ¶ 53]. Liberty later determined that Mirriah McConner, a former employee of defendants, was responsible for the fraudulent diversion of Liberty customers' tax refunds. [DE 190, ¶ 89]; [DE 200, ¶ 89].

In February of 2021, Liberty received a whistleblower report from Adina Olds, an employee of defendants, on the hotline Liberty was required to maintain by the terms of the consent decree. [DE 190, ¶ 68–69]; [DE 200, ¶ 68–69]. Olds reported that Cindy Serbus instructed employees to share their PTINs with other employees who did not have PTINs. [DE 114-15]; [DE 108-11]. Richard Ernst, the attorney overseeing Liberty's compliance with the consent order, spoke

with Olds and three other employees who indicated defendants required PTIN sharing so that the non-PTIN-holding employees could prepare tax returns for customers. [DE 190, ¶ 77–79]; [DE 200, ¶ 77–79]. Both Olds and Lampron testified in their depositions that they were required to share passwords and logins related to their PTINs. [DE 187-14]; [DE 187-10].

After investigating the login and PTIN sharing, on February 26, 2021, Liberty terminated the defendants' franchise agreements and sent them a notice of termination. [DE 190, ¶ 95]; [DE 200, ¶ 95]. Liberty seized the franchisees' stores, began to operate them as company stores, and filed this lawsuit. [DE 190, ¶ 98]; [DE 200, ¶ 98]. Defendants contend that Liberty terminated the franchise agreement because it wanted to take the profitable businesses for itself, and that the reasoning Liberty provides based on impermissible sharing of logins and PTINs is a pretext.

Two claims asserted against the defendant franchisees remain pending before the Court: (1) breach of franchise agreements and (2) money owed under the two promissory notes.

SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless there are no genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). In determining whether a genuine issue of material fact exists for trial, a trial court views the evidence and the inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, "[t]he mere existence of a scintilla of evidence" in support of the nonmoving party's position is not sufficient to defeat a motion for summary

5

judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (internal quotation marks and citations omitted). Speculative or conclusory allegations will not suffice. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002).

## DISCUSSION

### I. Breach of Franchise Agreements

This case is governed by Virginia law. [DE 67]. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323 (2015). "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *W. F. Magann Corp. v. Virginia-Carolina Electrical Works, Inc.*, 203 Va. 259, 264 (1962). "When a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.*, 276 Va. 285, 289 (2008). "Nevertheless, when the first breaching party commits a material breach, that party cannot enforce the contract." *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 154 (2001).

Section 6(u) of the parties' franchise agreements provides: "You agree to comply with all federal, state and local laws, regulations, ordinances and the like, and to be responsible for such compliance by all employees of the Franchised Business." [DE 9-2]. Defendant's EFIN appeared on all the fraudulent returns altered by defendants' former employee McConner, who redirected

6

and stole Liberty customers' tax refunds. Because electronic return originators may "authorize members of their firms or designated employees to sign for them, but the EROs are still responsible for the electronic returns originated by their firms," defendants are responsible for the fraudulent returns. [DE 190, ¶ 28]; [DE 200, ¶ 28] (quoting IRS Publication 1345). Defendants breached the franchise agreement.

For the first time in their response brief [DE 19] to plaintiffs' motion for summary judgment, defendants argue that the fraud was the result of a "hack" that exploited weaknesses in Liberty's electronic filing software. Liberty provided this software and required franchisees to use it. [DE 9-2]. Different user accounts on Liberty's software have different "permissions." Some user accounts, for instance, had permission to create new accounts for new users. If a scammer had such a person's login credentials, she could log in as the user, create new accounts for herself, and grant those new accounts permissions that would allow her to alter customers' tax returns. Defendants contend that this weakness is what facilitated the fraudulent diversion of tax refunds. [DE 199].

There is no evidence, however, that a system-wide hack occurred. Of Liberty's numerous locations, nationwide, the evidence presented on summary judgment indicates only the defendants' stores were afflicted by this kind of fraud. There is no genuine issue for trial as to whether Liberty's system facilitated the fraud.

Liberty theorizes that defendants' PTIN-sharing policies permitted the fraud. They adopt the story told by Adina Olds, who claims the defendants condoned rampant PTIN-sharing to increase efficiency. Defendants deny wrongdoing, and state their policy: "a non-PTIN employee could log in to Fusion to do data entry for a PTIN employee under the supervision of the PTIN employee . . . the PTIN employee was responsible for actually reviewing the return and sending it

7

to the IRS." [DE 200, ¶ 70]. Defendants also impugn Olds' credibility, noting that she was habitually dissatisfied with past employers, resentful of Cindy Serbus, misunderstood IRS rules regarding PTIN use, and exaggerated defendants' PTIN-sharing policies in retribution for what she considered mistreatment. *Id.*

Olds' credibility and the exact terms of defendants' PTIN-sharing policies are immaterial. Whether or not defendants' PTIN and other login-credential-sharing policies facially violated the terms of the consent order, IRS regulation, or any other relevant rule, those policies allowed the submission of fraudulent returns—bearing defendants' EFIN as an attestation of their accuracy— and the ensuing theft of customer tax returns. Defendants are responsible for the employee noncompliance that facilitated the fraud.

*a. Section 8(b) of the Franchise Agreements Permitted Liberty to Terminate Without Notice*

Defendants assert several defenses to Liberty's claim for breach of the franchise agreements. Chiefly, they contend that Liberty was the first party to breach the agreement by seizing defendants' stores without notice or an opportunity to cure, and therefore cannot enforce the contract against defendants. *See Countryside Orthopaedics*, 261 Va. at 154. The Court has already determined that defendants breached the agreements; Liberty terminated the agreements without notice only after defendants' breach. Furthermore, Liberty was entitled to terminate the agreements without notice pursuant to section 8(b). Section 8(b) of the franchise agreements entitles Liberty to terminate the agreement without notice or an opportunity to cure when Liberty determines that the franchisee "has committed a material violation of any law, ordinance, rule or regulation of a governmental agency or department reasonably associated with the operation of the Franchised Business," or when the franchisee has "committed any act that is or could be, in Liberty's determination, harmful, prejudicial or injurious to the Liberty brand."

In light of the consent order expressly prohibiting PTIN sharing and the numerous statements of defendants' employees that defendants required them to share PTINs, Liberty reasonably determined that the defendants had committed acts violating relevant IRS rules or which could be injurious to the Liberty brand. Similarly, the fraudulent returns on which defendants' EFIN appeared indicate a material violation of relevant regulations. In isolation, section 8(b) appears to permit Liberty to terminate the franchise agreements without notice under those circumstances.

Defendants point to section 8(c), which provides reasons for which Liberty may terminate the agreement after giving notice and an opportunity to cure. One such reason is when the franchisee fails "to comply with IRS standards applicable to e-file providers as stated in IRS Publications 3112, 1345 or another or successor IRS publication applicable to e-file providers or [fails] to comply with state or local regulations related to electronic filing." [DE 9-2]. Defendants contend section 8(c), which more specifically contemplates the sharing of PTINs as a cause for termination, is the applicable provision, and that Liberty was therefore required to give defendants notice and an opportunity to cure before terminating the franchise agreements. Like section 8(b), section 8(c) in isolation appears to permit Liberty to terminate the agreements with notice and an opportunity to cure.

Defendants rely on *Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 573 (Va. 2011) for the proposition that "a specific provision of a contract governs over one that is more general in nature." Since 8(c) more specifically addresses PTIN sharing as a cause for termination, defendants argue it applies, and 8(b) does not. *Condo. Servs.*, however, explains that "where there are two clauses in any respect *conflicting*, that which is specially directed to a particular matter controls in respect thereto over one which is general in

9

its terms." *Id.* (citing *Mutual Life Ins. Co. v. Hill*, 193 U.S. 551, 558 (1904)) (emphasis added). The two clauses in this case, 8(b) and 8(c), do not conflict. The sharing of PTINs is a material violation of IRS rules, such that 8(b) may apply, and at the same time it is a failure "to comply with IRS standards applicable to e-file providers," such that 8(c) may apply. The same is true of the submission of fraudulent returns bearing defendants' EFIN. Section 8(c) entitles Liberty to terminate the agreements under certain circumstances after giving notice and an opportunity to cure, but it does not impose a notice requirement on terminations which Liberty might effect under either 8(b) or 8(c). Liberty was within its contractual rights to terminate the franchise agreements under section 8(b) without giving notice or an opportunity to cure.

b. *Liberty's Contractual Obligation to Provide Support for use of its Software*

Defendants also purport that Liberty was the first to breach the contract because it failed to provide technical support for its electronic filing system. Section 5 of the franchise agreements describes Liberty's obligations to the franchisee. Section 5(f) states, "Liberty provides reasonable telephone and/or internet support for your questions regarding federal and state individual income tax return preparation, electronic filing, and the use of software specified by Liberty." [DE 9-2]. Defendants argue that Liberty alone was capable of blacklisting users from accessing the software, and by failing to blacklist the employees suspected of perpetrating the fraud at defendants' stores, Liberty failed to provide the support promised in the franchise agreements. For one thing, section 5(f) seems to contemplate troubleshooting assistance with use of the software, not management of former employees' account access. In any event, blacklisting rogue employees from the system was only necessary because of defendants' breach of the franchise agreements resulting in the submission of fraudulent returns. On this theory, Liberty could not have been the first to breach.

*c. Liberty Sufficiently Pled its Breach of Franchise Agreement Claim*

Finally, defendants argue the complaint sets out only allegations of post-termination breach, and that Count I for breach of the franchise agreement was not properly pled as to the PTIN-sharing theory. While the assertion of Count I focuses primarily on defendants' alleged post-termination breaches, it alleges facts surrounding the PTIN-sharing and asserts that Liberty suffered damages as a result of defendants' "past, present, and potential breaches." [DE 9]. These include damages resulting from the alleged PTIN-sharing, not only the alleged post-termination breaches allegedly occurring at the time of the complaint's drafting. The breach of finance agreement claim is sufficiently pled.

*d. Defendants' Recoupment Defense*

Defendants assert a defense of recoupment, primarily aimed at diminishing the amounts due under the promissory notes discussed below, but applicable to the breach of franchise agreement as well. Because asserting a statutory recoupment defense does not preclude a party from asserting a common law recoupment defense as well—and defendants do not specify which kind they assert—the Court construes defendants' second amended answer [DE 179] as asserting both. *See Rosenbloom v. Integrated Sec. Sys., Inc.*, 73 Va. Cir. 71 (2007). "The elements of the defense of recoupment are that the claim 1) arises from the same transaction or occurrence as the main claim, 2) seeks relief of the same kind and nature as that sought by the main claim, and 3) is purely defensive." *Dowell v. G & G Motorcycles, Inc.*, No. 3:14CV263, 2014 WL 6712893, at *2 (E.D. Va. Nov. 26, 2014).

Recoupment "is the right of the defendant to cut down or diminish the claim of the plaintiff in consequence of his failure to comply with some provision of the contract sought to be enforced." *Id.* at *2. "The difference between set-off, commonlaw recoupment, and statutory recoupment

admirably appears in a note by Prof. Lile, 7 Va. Law Reg. 332." *Dexter-Portland Cement Co. v. Acme Supply Co.*, 147 Va. 758, 766 (1926). Where the pleading of setoff may arise "out of some transaction dehors the transaction sued on," both common law and statutory recoupment require some relationship between the transaction from which the claim arises and that from which the defense arises. *See id.* Particularly, a plea of common law recoupment "arises out of the contract sued on," whereas statutory recoupment may arise from the same transaction or occurrence as the contract sued on. *See id.*, *Dowell*, No. 3:14CV263, 2014 WL 6712893 at *3. Additionally, to properly plead a defense of statutory recoupment, defendant "must allege the dollar amount to which it believes it is entitled in its pleading." *Rosenbloom*, 73 Va. Cir. 71 (2007).

Plaintiff argues defendants improperly pled their statutory recoupment defense by failing to provide a dollar amount. Plaintiffs' second amended answer [DE 179] incorporates by reference an earlier filing asserting now-withdrawn counterclaims against Liberty [DE 68]. Those counterclaims alleged damages "in excess of $415,758 of unpaid fees and rebates for returns prepared prior to Liberty's wrongful termination of Defendants' franchise agreements." [DE 68]. The parties routinely refer to an amount of $416,758, rather than $415,758, so it appears this was a typographical error. Defendants' counterclaim also alleged that by "wrongfully terminating Defendants' franchise agreements at the end of February 2021, Liberty destroyed the future value of the franchises to Defendants, which by Liberty's own calculation is in excess of $2.5 million." *Id.* While these figures suffice to plead a statutory recoupment defense, defendants cannot prevail on either theory. First, because the franchise agreement authorized Liberty's termination, defendants' loss of future value in the stores did not arise from Liberty's breach.

Nor did Liberty's seizure of the $415,758 in unpaid fees and rebates constitute a breach of the franchise agreement. Defendant purports this nonpayment violated sections 4(k), 9(a), and 11

12

of the franchise agreements. Section 4(k) of the franchise agreements states, "all of the tax preparation, transmitter, software, and electronic filing fees, and any rebates that you receive from Financial Products or customers who purchase Financial Products, and all other revenue due to Franchisee under this Agreement and all other agreements with Liberty and the Affiliated Companies, shall initially be paid to Liberty . . . Liberty will remit any remaining balance to you from the above described fees and rebates after deducting monies you owe to Liberty . . ." [DE 9-2]. Liberty receives revenues, conducts an accounting of what is due to the franchisee, and remits that sum. After the franchise agreement was terminated, there was no "revenue due to the Franchisee under this Agreement." *Id.*

The franchise agreements at section 9(a) and 11 provide Liberty a post-termination option to elect to purchase the terminated franchisees' assets [DE 9-2]. Defendants claim that by seizing their stores, including some personal property therein, Liberty breached the franchise agreement and converted their property. There is no live conversion claim in this case, and a tort claim for conversion does not "seek relief of the same kind and nature as" the contract claim for breach of the franchise agreement. *See Dowell*, No. 3:14CV263, 2014 WL 6712893 at *2.

## II. Promissory Notes

Liberty also asserts a claim for accounts receivable and default under the two promissory notes. Defendants do not dispute that the promissory notes reflect valid debts. [DE 199, p. 20], but assert a recoupment defense. In addition to the reasons discussed above, defendants cannot prevail on their recoupment defense against the promissory notes claim because Liberty's alleged breaches arise from a separate transaction.

Plaintiff relies on *Natucultura, S.A. v. Bloomaker USA, Inc.* to establish that defendants cannot assert a recoupment defense based on breach of the franchise agreement to diminish the

13

amount due under the promissory notes. 96 Va. Cir. 7 (2017) ("recoupment has been upheld by the Virginia Supreme Court where a defendant brought the defense for a loss under the *same contract*, not under a theory of mitigation or resale theory") (emphasis added). Defendants retort that Virginia courts have found a valid recoupment defense arising from a technically different transaction than the contract claim against which the defense is asserted when the two transactions are related. *Natacultura*, defendants argue, is a poor example because the two transactions were not even between the same two parties. They offer *Dowell v. G & G Motorcycles, Inc.* as a counterexample. No. 3:14CV263, 2014 WL 6712893 (E.D. Va. Nov. 26, 2014).

In *Dowell*, the parties contracted for sale of a motorcycle dealership. *Id.* at *1. Because the precise inventory to be sold would change between the date of the purchase agreement and the date of closing, the asset purchase agreement provided for an adjustment of the purchase price for inventory after the parties conducted a joint audit. Only the seller conducted the audit. The buyer executed a note based on the seller's valuation of the inventory. When the final payment came due, the buyer refused to pay it, claiming the assets he purchased had a lower value than the seller determined. *Id.* The seller sued, and the buyer asserted a recoupment defense. The Dowell court found the recoupment defense was available, despite that the debt instrument which the buyer breached, and the purchase agreement, which the seller breached by conducting an improper inventory, were technically separate contracts. *Id.* at *2 ("he is entitled to recoupment from the transaction that gave rise to the note—the sale of the business").

In the present case, although the franchise agreement and the promissory notes are agreements between the same parties, they are separate transactions such that recoupment is not available. The franchise agreements contemplate "Financing through Liberty. Liberty may, in Liberty's sole discretion, provide financing for a portion of the initial franchise fee or other costs

14

associated with the Franchised Business." [DE 9-4]. The financing agreement then sets out further terms and preconditions and explains the construction of the contemplated loans. In *Dowell*, a debt instrument was necessary to carry out the payment already agreed to in the purchase agreement. In fact, the purchase agreement stated the method for deciding the amount owed in the expected loan—the joint audit. Here, nothing in the franchise agreement compelled Liberty to offer the loan or determined the amount that would be owed. The loan and franchise agreements are separate transactions.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [DE 181] is DENIED and plaintiff's motion for summary judgment [DE 186] is GRANTED. The clerk is DIRECTED to enter judgment for plaintiff in the amount of $264,470 plus post-judgment interest at the rate established by 28 U.S.C. § 1961 for Count I, $178,481.32, plus annual interest at the 12% rate set by the promissory notes for Count II, and plaintiff's reasonable attorney's fees as agreed in section 9(d) of the Franchise Agreement [DE 9-11].

SO ORDERED, this 21 day of January 2026.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE